**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAURA J. RAMOS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 13-0328 (ABJ) |
| | ) ***SEALED*** |
| MERRICK B. GARLAND, | ) |
| as U.S. Attorney General, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

In 2013, plaintiff Laura J. Ramos brought this employment discrimination action against the Attorney General of the United States, arising out of her employment at the Federal Bureau of Investigation ("FBI"). Compl. [Dkt. # 1]. Plaintiff has twice amended her complaint, Am. Compl. [Dkt. # 50] ("First Am. Compl."), Second Am. Compl. & Jury Demand [Dkt. # 77] ("Second Am. Compl."), and the Court has ruled on several motions narrowing the dispute. *See* Min. Entry (Mar. 21, 2014) (dismissing hostile work environment claim); Mem. Op. & Order of July 7, 2015 [Dkt. # 37] ("July 2015 Mem. Op.") (granting judgment on the pleadings for defendant on disparate treatment claim); Min. Order (Nov. 11, 2015) (ruling on the record denying in part plaintiff's motion to amend her complaint); Mem. Op. of Jan. 31, 2017 [Dkt. # 71] ("January 2017 Mem. Op.") & Order of Jan. 31, 2017 [Dkt. # 72] ("January 2017 Order") (granting summary judgment for defendant regarding plaintiff's 2011 performance rating and constructive demotion claims). In August 2020, the Court denied plaintiff's motion to file a third amended complaint to add retaliation claims regarding alleged acts that occurred after her voluntary transfer to the FBI's Baltimore Division in 2014. Mem. Op. & Order of Aug. 11, 2020

[Dkt. # 141] ("August 2020 Mem. Op."). The sole remaining claim in the second amended complaint alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. 42 U.S.C. §§ 2000e *et seq*.

Pending before the Court is defendant's motion for summary judgment on the retaliation claim. Def.'s Mot. for Summ. J. & Mem. of P. & A. in Supp. [Dkt. # 133] ("Def.'s Mot."). Upon review of controlling case law and the entire record in the case,[1] the Court will grant the motion, bringing this matter to a close. A separate order will issue.

## BACKGROUND

### I.      Factual Background[2]

#### A. Facts underlying the alleged retaliation in 2011.

The following facts are undisputed unless otherwise noted.[3] Plaintiff is a Hispanic woman who was employed by the FBI as a Supervisory Special Agent ("SSA"), GS-14, in Unit 1D of the Counterintelligence Division between 2010 and 2014. Def.'s SOF ¶¶ 1–2, 65. During this time,

---

1       Exs. 1–10 to Def.'s Mot. [Dkts. ## 133-1–133-10]; Pl.'s Opp. to Def.'s Mot. and Mem. of P. & A. in Supp. [Dkt. # 136] ("Pl.'s Opp."); Exs. 1–13 to Pl.'s Opp. [Dkts. ## 137-1–137-13] (SEALED); Def.'s Reply in Supp. of Mot. for Summ. J. [Dkt. # 140] ("Def.'s Reply").

2       The factual background of this case has been laid out in detail in previous opinions of this Court. *See* January 2017 Mem. Op. at 2–4; August 2020 Mem. Op. at 3–5. The Court will only summarize the facts pertaining to the remaining retaliation issue here.

3       Pursuant to Local Civil Rule 7(h)(1), defendant submitted a statement of undisputed material facts in support of its motion for summary judgment. Def.'s Statement of Material Facts in Supp. of Def.'s Mot. [Dkt. # 133] at 25–34 ("Def.'s SOF"). Plaintiff filed an opposition, Pl.'s Opp. to Def.'s Statement of Material Facts [Dkt. # 136-2] ("Pl.'s Opp. to SOF"), and an additional statement of genuinely disputed material facts. Pl.'s Statement of Additional Material Facts that Present Genuine Issues for Trial [Dkt. # 136-3] ("Pl.'s Addt'l SOF"). Defendant filed a reply to plaintiff's opposition, Def.'s Reply to Pl.'s Opp. to Def.'s Statement of Material Facts [Dkt. # 140-1] ("Def.'s Reply to SOF"), and a response to plaintiff's additional statement. Def.'s Resp. to Pl.'s Statement of Additional Material Facts [Dkt. # 140-2] ("Def.'s Resp. to Addt'l SOF"). For undisputed facts, the Court will cite the parties' statements of facts; for disputed facts, the Court will cite to the evidence in the record.

she had responsibility as a program manager for a number of projects, including those she refers

to as the ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

In 2011, plaintiff was supervised by Diana Race, who is described as the Acting Unit Chief

("AUC") of Unit 1D.  Def.'s SOF ¶ 4.  In May of that year, plaintiff filed an informal Equal

Employment Opportunity ("EEO") complaint against Race, and she filed a formal complaint on

August 21, 2011.  Pl.'s Addt'l SOF ¶ 3; Def.'s Resp. to Addt'l SOF ¶ 3; *see also* Ex. 1

[Dkt. # 137-1] (SEALED) ("Pl. Produced Docs") at 2–4.[4]  She alleged that AUC Race treated her

differently from non-Hispanic employees.[5]

At some point after May 26, 2011, in response to the "tension" with AUC Race, plaintiff

requested a transfer away from Unit 1D.  Def.'s SOF ¶ 4; Pl.'s Opp. to SOF ¶ 4.  Between that

time and August 2011, another supervisor, Assistant Section Chief ("ASC") Edward Finnegan,

---

4       Agency Case No. FBI-2011-00204, EEOC Case No. 570-2012-00782X.

5       On July 7, 2015, the Court granted judgment on the pleadings for defendant on plaintiff's
disparate treatment claim.  *See* July 2015 Mem. Op. at 7–10.

looked for available transfer positions for her.[6]   Def.'s SOF ¶ 7; *see also* Ex. 2 [Dkt. # 137-2]

(SEALED) ("Def. Produced Docs") at 22–38.   On August 25, 2011, plaintiff and ASC Finnegan

discussed the fact that in order to be eligible to apply for promotion opportunities

---

6       For example, in response to an inquiry sent by plaintiff on August 2, 2011, at 2:31 pm,
ASC Finnegan sent a number of emails out looking for available transfers.  Ex. 1 to [Dkt. # 133-1]
("Def.'s Paper Exhibits") at 20.

        On August 2, 2011, at 3:28 pm, ASC Finnegan sent this email to Greg Ruppert with the
subject "Lateral Transfer":

            I'm the ASC in ███████████████ .  I have an SSA . . . who is
            looking for a transfer to a different section – I wondered if your section
            would be interested in an experienced SSA with a CI background.  I think
            (but would have to confirm) that a lateral can be done if both ADs agree but
            I thought I would see if you had any interest before going further.   The
            backstory – which I'd be happy to give you in detail – is a personality
            conflict between her and [AUC Race].  Neither is at fault, but they just can't
            work together and I can't replace the A/UC yet, so this agent made the
            request to move.  I'm sure you have no shortage of applicants for your
            positions so you may have people already in mind or no openings to start
            with, but if you're interested, let me know.  Thanks.

*Id*. at 18.

        Also on August 2, 2011, at 3:37 pm, ASC Finnegan sent the following email to four other
individuals, with the subject "Lateral Transfer":

            I know I've asked this offline of at least some of you, but:  I have an SSA
            looking to lateral over to a different CD section.   Some personality
            differences for which neither one is at fault but this one requested to go
            somewhere else.  Any of you have a place for an SSA?  I'll be happy to go
            into detail with anyone interested, but let me preface it by saying it's not a
            case of dumping a bad performer – just a case of two people not getting
            along and this one is willing to move.  Anyway, let me know up or down
            your interest.  Thanks.

*Id*. at 16.

        On August 4, 2011, ASC Finnegan updated plaintiff with the results of his search for
transfer positions (reporting no immediately open positions in five units) and offering to "talk[]
with CPC . . . as well" for her.  *Id*. at 20.

immediately upon transfer, plaintiff would have to transfer within the division.[7]  Def. Produced

Docs at 48–49.  He clarified his recollection that it was her preference to stay in the division later

a few days later.[8]

Plaintiff expressed a desire to complete her transfer via a process called "temporary duty

assignment" ("TDY"), which allows an agent to transfer units within the FBI but prevents the

transferor unit from "backfill[ing] the position during that temporary assignment."  Def. Produced

---

7       On August 25, 2011, plaintiff emailed ASC Finnegan:

> Just for clarification, I don't believe CD-6D has a vacancy/opening, they
> have a spot that they need to hold open for someone who will be tdy for one
> year.  Since you were having difficulties in trying to transfer me elsewhere,
> I offered a possible solution to you by placing me on tdy status to either 6D
> or 1B with the clear understanding that I would be tdy while putting in for
> job postings.

> With that being said, did [the Human Resources Division] clarify if the
> clock would start over [for applying for promotions] with a lateral move to
> another division?

Def. Produced Docs at 49.  ASC Finnegan responded two minutes later, "They said the clock
doesn't reset for moves within the division; I read that as it does reset for moves out of the
division."  *Id*.

8       On August 29, 2011, ASC Finnegan provided another update to plaintiff and asked to
clarify her preferences regarding a potential transfer:

> I finally heard from IOD this morning – see below.  Nothing open at the
> moment.

> I was reading the email you sent me last week and I think we have slightly
> different recollections on one point and that's a transfer within the section.
> When this first came up, I asked whether another unit in CD-1 would work,
> but as I recall you felt the atmosphere within the whole section was so
> tainted that moving to another unit within the section wouldn't solve the
> problem.  After seeing the email that referenced 1B as an alternative, that is
> something that we may be able to accomplish since Jeff Rhule is leaving.
> We should talk about it tomorrow either way.

Def. Produced Docs at 51.

Docs at 58, 116–18.  Her supervisors advised her that it would not be possible to fulfill both her request that she remain within the division to preserve promotional opportunities, and the request to transfer temporarily via TDY, so any transfer would have to be permanent.  Def. Produced Docs at 58–65.

On August 31, 2011, ASC Finnegan offered to transfer plaintiff to Unit 1B within the larger division.  Def. Produced Docs at 58.  Also on that date, plaintiff formalized her EEO complaint to meet the September 1, 2011 deadline.  Pl.'s Addt'l SOF ¶ 31.  When Finnegan did not hear back from the plaintiff, he reiterated the offer on September 5, 2011, specifying that the transfer could not be completed via TDY.[9]  Def.'s SOF ¶ 28.  The record reflects that plaintiff responded to say

---

9    ASC Finnegan's email to plaintiff on September 5:

> I don't know if you came by on Thursday afternoon after I saw you in the hallway and we just missed each other, and since you were off Friday, we didn't have a chance to talk again after our brief conversation in the hallway. I know Ken sat down with you as he did with each employee in the unit about his expectations, plans, etc., and that he told you he would be happy to see you remain in [Unit] 1D if you were interested in doing that. I'm sure you've given things some thought over the weekend but now we'll need to make the decision about where you want to go. As I told you, Andy Pierce [the unit director of Unit 1B] has already asked when you were coming over – he'd be thrilled to have you. If, however, after talking with Ken you want to give [Unit] 1D another chance, that's fine as well. I'll just need you to let me know which option you would prefer. Like I said before, and I talked to Doug and Ken about it since, the option of a TDY out of the section just doesn't provide a practical solution and at the moment we just can't spare the resources for the reasons I've explained before. I will be out of the office tomorrow on official travel – feel free to let either Doug or Ken know which you prefer (or BB me and I will check when I can – needs to be off while airborne) and we can finally bring this to a resolution. Hope you had a good holiday weekend.

Def. Produced Docs at 59–60.

that she accepted the offer "as an interim measure" on September 9, 2011, at 1:07 pm,[10] but at

3:49 pm that day, ASC Finnegan sent an email informing plaintiff that since he had just learned

there was now a formal EEO process underway to resolve plaintiff's complaints through

mediation, he would defer to that process rather than initiating a transfer himself.[11]

### B.  Facts underlying the alleged retaliation in 2013–2014

#### i.  Diminution of duties

The next set of events involved in the complaint took place more than a year later.

Beginning in late 2012, plaintiff was out of the office on extended medical leave, Pl.'s Addt'l SOF

¶ 47, and Acting Unit Chief Steven Jett was required to assume plaintiff's duties with respect to

the ███████████████████████████. *Id.*; Def.'s SOF ¶ 66.  Given the work involved,

---

10      Plaintiff's 1:07 pm email to ASC Finnegan on September 9:

> I know you were in New York on Wednesday and we were not able to sit
> down and discuss this matter further as per our email communication on
> Monday 9/5 via blackberry.  My understanding is that CD-1 will not allow
> me to TDY to another section or division.  Additionally, CD-1 has had some
> difficulty these past few months in finding a direct placement transfer
> position for me.  Therefore, please note that as an interim measure, I will
> accept the opportunity to move over to CD-1B which you stated could be
> effective almost immediately.  Please advise.

Def. Produced Docs at 62.

11      ASC Finnegan's 3:49 pm email stated:

> I'm sorry we missed each other.  I've been notified that the EEO matter has
> now been made formal and that the next step is mediation.  Since there's
> now an official, formal process underway to address the issue, I think the
> most appropriate course of action now is to allow that process to determine
> where you go and under what circumstances.  I wouldn't want any
> continued direct action on my part to be construed as interfering with the
> mediation process.

Def. Produced Docs at 62.

AUC Jett emailed plaintiff on January 3, 2013, to advise her that he was seeking authorization to appoint someone to manage the program on a temporary basis for 90 days.[12]  Although AUC Jett and plaintiff discussed the possibility of requesting, in plaintiff's words, "[a TDY-er] who could come in and assist the unit with any matters that needed to get done[,]" AUC Jett did not recall, nor is there evidence in the record, that the suggestion was passed up the chain of command. Pl.'s Jett Deposition Excerpts at 29.[13]

---

[12]     On January 3, 2013, AUC Jett emailed plaintiff to notify her – while she was out on leave – that someone might come in temporarily as a "TDYer" for ninety days for the ▮▮▮▮:

> Morning.  I wanted to check in, give you a few updates, and then run something by you.
>
> We're thinking of asking WFO for a 90 day TDYer to come in and catch us up on your bigger program and to conduct a joint review with CD7 to make recommendations on what works, definitions, streamlining processes, etc. Since Ken has left, the A/UC thing is becoming a handful and I'm afraid I'll let things slip through the cracks and you could be handed a mess when you get back.
>
> Nothing is official, of course, WFO may say no, but I wanted to start with you just to give you a heads up in case you returned in a few weeks and found someone doing your job for 90 days.  If it sounds like a bad idea, let me know.  In the meantime, I'll call Kevin and see if it's even feasible if we ask.
>
> In other news, the unit is moving back to corridor 0 (across from where we were previously) sometime at the end of the month.  I don't like rifling through people's things, so I wanted to check in and ask if it were ok to box things up for you when the move happens.
>
> Postings for a new UC and 3 SSAs should go out this week or next.
>
> Hope all is well.  Let me know if you need any errands run in the building.

Ex. 9 [Dkt. # 137-9] (SEALED) ("Pl.'s Jett Deposition Excerpts") at 31.

[13]     Plaintiff returned to the office later in January of 2013.  *See* Def. Produced Docs at 135.

On March 13, 2013, plaintiff filed this lawsuit in federal court, based on the events that occurred in 2011.  *See* Compl.

On March 28, 2013, AUC Jett transferred SSA Anthony Wagoner to serve as the ███ program manager until his upcoming retirement, *see* Def. Produced Docs at 126, and plaintiff was designated as the "[b]ackup" program manager.  *Id.* at 135–36.  Also on March 28, 2013, plaintiff contacted an EEO counselor to initiate an informal complaint of retaliation.  *See* EEO Records [Dkt. # 137-3] (SEALED) at 4.  Between March and May 2013, plaintiff remained the program manager of ██████████████████████, *see* Def.'s Ramos Deposition Excerpts [Dkt. # 133-9] at 20, and on May 31, 2013, when Wagoner retired, she resumed her role as program manager of ███ as well.  Def.'s SOF ¶ 72; Def. Produced Docs at 147.  Plaintiff formalized her second EEO complaint from March 2013 on September 27, 2013.  *See* EEO Records at 4.[14]

Another complained of action is that during an unspecified portion of 2013 to 2014,[15] plaintiff was required to have someone else "input and validate her time and attendance"  and to "report to Unit Chief Snow any time [she] left [her] desk," and that she "lost access to the main investigative database."  Pl.'s Addt'l SOF ¶¶ 58–60, citing Pl.'s Ramos Deposition Excerpts [Dkt. # 137-12] (SEALED) at 16–19.[16]

---

14    Plaintiff also alleged in her second amended complaint that in October 2013, she was again "reallocat[ed from] her work assignments from the high priority programs with which she was involved to predominately low priority programs."  Second Am. Compl. ¶ 17(a)(i).

15    The record is incomplete on this point, but plaintiff appears from the context to be discussing the timing of these changes in her 2019 deposition:  "[I]t was sometime within 2013, 2014."  Pl.'s Ramos Deposition Excerpts at 20.

16    *See also* Def.'s Resp. to Addt'l SOF ¶¶ 58–60 (noting that these facts are undisputed but "are not material to Plaintiff's claim of retaliation").

### ii.     Denial of opportunities to transfer

The retaliation claim in the second amended complaint also raised questions about the denial of a transfer opportunity in October 2013 and two in 2014.  Unit Chief ("UC") Jonathan Snow notified the members of Unit 1D on October 21, 2013, that the Internal Operations Division ("IOD") was looking for a Supervisory Special Agent to "swap."  Def.'s SOF ¶ 34; Pl.'s Opp. to SOF ¶ 34.  Plaintiff volunteered for the transfer, and UC Snow transmitted information related to her and to two others, Benton Larson and Tim Maruska, to Section Chief ("SC") Brian Brooks for consideration.[17]  Def.'s SOF ¶ 35; Pl.'s Opp. to SOF ¶ 35.   The information included the candidates' bureau entry on duty ("EOD") date and their headquarters entry on duty ("HQ EOD")

---

17     *See* October 22, 2013 email from SC Brooks to Peter Strzok, assistant to DAD Smith:

Here are the names provided by the unit chiefs (names are in alphabetical order) for consideration for the transfer to IOD:



Def. Produced Docs at 149–150.

date.  *Id.*  Two other divisions also made recommendations.[18]  Def. Produced Docs at 151.

SSA Larsen was ultimately selected for the role by Counterintelligence Division Deputy Assistant

Director ("DAD") Debra Smith.   Def.'s SOF ¶¶ 37, 41.   DAD Smith's stated reason for her

selection was that she "went by EOD date."  Def. Produced Docs at 152.

Another opportunity arose on March 27, 2014, when the Transfer Unit of the

FBI announced its need for a "critical needs transfer" to the Boston Field Office ("BFO"),

Def.'s SOF ¶ 45; the open position was for a GS-13-ranked Special Agent.   Pl.'s Opp. to SOF

¶ 46.  On April 11, 2014, plaintiff requested consideration for the position, and she was "fully

recommended" by the head of the Counterintelligence Division.   Def.'s SOF  ¶¶  47–48.

The Transfer Unit denied plaintiff's transfer request to the BFO, though, because her 2013

performance appraisal rating ("PAR") ███████████████████████[19]  Def.'s SOF ¶ 56.

Plaintiff applied for another transfer on May 20, 2014, after the Transfer Unit solicited

Special Agents for a "Voluntary Rotational Transfer" ("VRT") to the New York Field Office

("NYFO").  Def.'s SOF ¶¶ 49, 52.  Again, plaintiff was "fully recommended" by the head of the

Counterintelligence Division for the GS-13 Special Agent position.  *Id.* ¶ 53.  Candidates for a

VRT are required to have at least a "successful" rating on their latest PAR, *id.* ¶ 51, though, and

---

18   SSA ██████████ was recommended from another division, CD-8C Unit, on
October 30, 2011, and ██████ was also recommended.  SSA
██████.  *Id.*  There is no evidence in the record regarding the recommendation of ██████;
his rank, status, division, and Bureau and HQ EOD dates are unknown.  *Id.* at 152.

19   "Plaintiff acknowledges that Defendant's Statement is true as written, however, Plaintiff
asserts a genuine issue of material fact exists as to whether the stated reason for the denial of her
request to transfer was pretextual . . . [because] [t]his review was a drastic, unexplained departure
from her previous years' ratings."  Pl.'s Opp. to SOF ¶ 56.

the Transfer Unit denied plaintiff's transfer request to the NYFO, citing her ████████

███████████████████.[20]  *Id.* ¶ 56.

### C.  The retaliation count in the Second Amended Complaint

Based on all of these facts, the retaliation count that remains in this case claims that plaintiff was subjected to adverse employment actions beginning in 2011 in retaliation for lodging the original discrimination complaint with the EEO, and again in 2013, after she filed this lawsuit in March and submitted her second formal complaint to the EEO.  Second Am. Compl. ¶¶ 14–17.

The alleged retaliatory act in 2011 was ASC Finnegan's rescission of the offer to transfer plaintiff laterally from FBI Unit 1D to Unit 1B after plaintiff filed the formal complaint against her manager, AUC Race.  Second Am. Compl. ¶ 16.

Plaintiff alleges that the retaliation "continued unchecked" into 2013, although her supervisors changed during this time, and there are no alleged adverse events between September 2011 and February 2013.  Second Am. Compl. ¶ 17.  Plaintiff states that defendant diminished her responsibilities and authority after she filed this action on March 13, 2013,[21] and contacted an EEO counselor that month,[22] and that the retaliation continued through

---

20   On January 31, 2017, the Court granted summary judgment for defendant on plaintiff's claim regarding her November 2011 Performance Appraisal Report ("PAR") rating.  *See* January 2017 Order.  Plaintiff's motion to amend her complaint to allege that her 2013 PAR rating was retaliatory was denied two years prior.  *See* Min. Order (Nov. 10, 2015) (regarding paragraph 18(c) of the proposed amended complaint).

21   Service was effected on defendant on March 19, 2013.  Return of Serv. [Dkt. # 3].

22   On March 28, 2013, plaintiff contacted an EEO counselor at the FBI and filed a formal complaint on September 27, 2013.  Second Am. Compl. ¶ 10.  On July 31, 2015, the Department of Justice issued a final decision, *id.* ¶ 11, but neither party has provided the Court with information as to whether this matter was resolved.

November 2013.[23]  Second Am. Compl. ¶ 17(a).  The later set of challenged employment actions include:  (1) the reduction in the responsibilities and authority normally demanded of her position, such as oversight of a "high priority program[]" plaintiff had managed for a number of years and reassignment to "predominately low priority programs," and (2) repeated denials of requests to transfer out of her unit.  *See id.* ¶¶ 17(a)–(b).

Plaintiff seeks compensatory and punitive damages, as well as the restoration of "any leave spent on EEO matter which Plaintiff was forced to use" and "expungement of all documents and information related to this" matter from her FBI personnel files.  Second Am. Compl. ¶ 22.

Defendant has moved for summary judgment on the retaliation count on two grounds: that plaintiff has not alleged a materially adverse employment event, and that there were legitimate, non-retaliatory reasons for defendant's actions that plaintiff has not shown to be pretextual.  *See* Def.'s Mot. at 3.  Because the Court agrees with defendant that no reasonable jury could find that plaintiff suffered a materially adverse event while working for the FBI between 2011 and 2013, it will grant the motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

23      In 2014, plaintiff voluntarily transferred to the Baltimore Division of the FBI.  Ex. C [Dkt. # 126-3] ("Proposed Third Am. Compl.").  Plaintiff's claims are limited to the scope of the second amended complaint, and those which post-date her transfer are outside the scope of this litigation.  *See* August 2020 Mem. Op. at 8–9.

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

Title VII's anti-retaliation provision makes it unlawful for "an employer [to] 'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e-3(a). A plaintiff must show that retaliation was a "but-for" cause of the adverse employment action, rather than a substantial or "motivating" factor in the employer's decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

When a plaintiff's retaliation claim is based on circumstantial, rather than direct, evidence, the Court analyzes the claim under the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  Once the plaintiff has made that showing, the burden shifts to the defendant to produce a "legitimate" and "nondiscriminatory reason" for its actions.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  If an employer supplies such a reason, then the "burden-shifting framework disappears," and the Court must ask "whether a reasonable jury could infer . . . retaliation from all the evidence." *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

To establish a *prima facie* case of retaliation, "the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006).  An "adverse action" in the context of a retaliation claim is one that is "harmful to the point that [such action] could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57, quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006), and it is highly dependent on the "particular circumstances" of plaintiff's employment.  *Burlington N.*, 548 U.S. at 69.  The D.C. Circuit has noted that an actionable event is one that would "affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009), quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).

If a plaintiff cannot make a showing of material adversity, the inquiry ends there. *Chambers v. Dist. of Columbia*, 389 F. Supp. 3d 77, 92 (D.D.C. 2019), *aff'd Chambers v. Dist. of Columbia*, 988 F.3d 497 (D.C. Cir. 2021) ("[A]t the summary judgment stage, [plaintiff] must still, at a minimum, demonstrate that she suffered an adverse employment action."), citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

On a motion for summary judgment with respect to an actionable event, if the employer can "articulate some legitimate, nondiscriminatory reason" for the employment decision at issue, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the district court no longer needs to assess whether the plaintiff made out a *prima facie* claim.  *See Jones*, 557 F.3d at 677, citing *Brady*, 520 F.3d at 495.  Instead, the question before the court at that point would be whether plaintiff "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason" for the adverse action, and that the employer actually retaliated against the plaintiff.  *Brady*, 520 F.3d at 495.  In answering this question, though, "the strength of the plaintiff's *prima facie* case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation.  *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 n.4 (D.C. Cir. 1998).

The Supreme Court has held that if the official responsible for the allegedly adverse action is unaware of the employee's earlier EEO activity, then the employee cannot establish the causation needed to sustain a retaliation claim.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272–73 (2001); *see also Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (To establish the requisite causal connection, the plaintiff must come forward with evidence that her employer "had knowledge of [her] protected activity, and that the adverse personnel action

took place shortly after that activity."); *see also McIntyre v. Peters*, 460 F. Supp. 2d 125, 134 (D.D.C. 2006), citing *Laboy v. O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir. Mar. 13, 2002) ("To support a retaliation claim, a plaintiff must show that the alleged discriminating official's knowledge of prior protected activity preceded the official's contemplating adverse action."). Another factor to be considered is the temporal proximity of the challenged action and protected activity. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("For . . . retaliation, temporal proximity can indeed support an inference of causation, but only where the two events are very close in time.") (internal citation omitted).

## I.       The 2011 Rescission of the Lateral Transfer

First, plaintiff alleges that the FBI retaliated against her for reporting her supervisor AUC Race to the EEO in 2011 by rescinding its offer to transfer her. Putting aside the question of whether the chronology works – the record reflects that she was *offered* the opportunity to transfer after she lodged her complaint against AUC Race[24] – plaintiff has not met her burden to come forward with facts that give rise to a genuine dispute with respect to whether ASC Finnegan's withdrawal of his offer of a transfer materially altered the terms and conditions of her employment such that she suffered an adverse action under controlling Title VII precedent. Therefore, the action does not support a retaliation claim, and defendant is entitled to summary judgment.

---

24       The record is unclear when in August 2011 plaintiff filed her formal EEO complaint, *compare* Pl.'s Opp. at 11 n.3 ("[Plaintiff] submitted her formal EEO complaint on August 25, 2011") *with* Pl. Produced Docs at 4 (Complaint of Discrimination dated "08/26/2011"), but it is undisputed that it was received in the EEO on August 31, 2011, although the exact time is not known. *See* Pl.'s Addt'l SOF ¶¶ 30–31; Def.'s Resp. to Addt'l SOF ¶ 31. Whether or not the first offer to transfer to Unit 1B on August 31, 2011, at 5:56 pm, was nearly simultaneous with the filing of the formal EEO complaint, Def. Produced Docs at 58, it was offered to plaintiff again on September 5, 2011, days after the formal complaint was filed. *Id*. at 59–60.

### A.  There is evidence that the offer was accepted.

At the outset, the Court notes that defendant maintains that plaintiff never accepted the offer, so an agreement to transfer her could not have been rescinded, and this portion of the claim fails for that reason.  Def.'s SOF ¶ 31; Def.'s Reply to SOF ¶ 31.  But there is a genuine dispute of fact as to whether plaintiff accepted the offer to transfer to Unit 1B under the terms it was offered to her in ASC Finnegan's September 9, 2011 email, *see* Pl.'s Opp. to Def.'s SOF ¶ 31, so the Court cannot enter judgment for the defendant on this basis.

Plaintiff was offered the transfer to Unit 1D on August 31, 2011 at 5:56 pm, *see* Def. Produced Docs at 58, and she was prompted to consider the offer again on September 5, 2011. *See id*. at 59–60.  But before the offer to transfer was revoked by Finnegan at 3:49 pm on September 9, *id*. at 62, plaintiff transmitted an email stating that she was accepting the lateral transfer to Unit 1B "as an interim measure" at 1:07 pm that day.  *Id*. ("Therefore, please note that as an interim measure, I will accept the opportunity to move over to CD-1B.").  And plaintiff testified in her deposition, "I said, 'Yes, I will definitely accept the opportunity to go over to 1B and work there.'"  Pl.'s Ramos Deposition Excerpts at 8.

Defendant maintains that plaintiff's use of the language "as an interim measure" in her email made her acceptance conditional, so there was no agreed upon job change to be revoked. *See* Def.'s Mot. at 13.  But neither party has directed the Court to any other evidence that would shed light on what she meant by that.  Under Federal Rule of Civil Procedure 56, the Court is required to construe the facts in the light most favorable to the non-moving party.  Because a reasonable juror could find that the offer was accepted, the Court will move on to assess whether plaintiff presented evidence to show that the withdrawal of the transfer opportunity was an actionable adverse event.

**B.  Rescission of the lateral transfer offer is not an adverse employment action.**

In determining whether the rescission of an offer to transfer laterally can be considered an "adverse" employment action, this Court is bound to follow the decisions of the Court of Appeals. And the current law in this circuit is that ordinarily, a lateral transfer is not considered to be actionable under Title VII.  *See Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003), citing *Brown v. Brody* 199 F.3d 446, 457 (D.C. Cir. 1999).

But there are exceptions.  A denial of a transfer – even if it is lateral – might constitute an adverse employment action if it causes a plaintiff to experience "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010).

Applying these precedents, plaintiff has not established that she suffered an adverse action when her lateral transfer was denied.  The "terms and conditions" of plaintiff's employment were unaffected by the loss of the opportunity to move from Unit 1D to 1B.  The proposed transfer from was a lateral one with no evidence in the record of an impact on her salary or hours,[25] and plaintiff deliberately sought a move within the same unit so she would have already met the "minimum

---

25    *See also* Pl.'s Ramos Deposition Excerpts at 8 (plaintiff states that there would not have been an immediate change in her title or grade if she was transferred from Unit 1D to Unit 1B).

service requirements" needed to apply for future promotions.[26]   Pl.'s Opp. at 9–10, citing Def. Produced Docs at 48–49.

Plaintiff relies on *Ortiz-Diaz v. U.S. Dep't of Hous. and Urban Dev.*, 867 F.3d 70 (D.C. Cir. 2017), in support of her position that the withdrawal of the transfer opportunity was an actionable adverse event.  *See* Pl.'s Opp. at 16.  In that case, the plaintiff, an investigator in the Office of Inspector General at the Department of Housing and Urban Development, sued the agency under Title VII, complaining that his supervisor had discriminated against him when he denied multiple requests to be transferred.  *Ortiz-Diaz v. U.S. Dep't of Hous. and Urban Dev.*, 75 F. Supp. 3d 561, 563–64 (D.D.C. 2014).  The district court judge granted summary judgment in favor of the agency on the grounds that the plaintiff had not established that he had suffered a materially adverse event, *id.* at 568, and the D.C. Circuit reversed.  The Court noted that "[a]lthough lateral transfers to different positions within a Department offering the same pay and benefits are ordinarily not changes in the 'terms, conditions, or privileges of employment,' . . . a discriminatory denial of a lateral transfer away from a biased supervisor can certainly be actionable under Title VII, given the adverse impact on the employee's potential for career advancement." *Ortiz-Diaz*, 867 F.3d at 74.  The Court emphasized the "adversity Ortiz-Diaz faced as a result of the denial of transfer away from his allegedly discriminatory supervisor," *id.*, and for that reason, it found the "career-stifling transfer denials" to be actionable.  *Id.* at 75.

---

26     It is important to note that plaintiff sought to transfer within her larger unit in order to preserve the opportunities for promotion she had at that time, in her position in Unit 1D.  *See* Def. Produced Docs at 48–51 (email exchange between plaintiff and ASC Finnegan discussing how plaintiff could best maintain similar promotion opportunities in Unit 1B that she already had in Unit 1D and outlining the resulting potential transfer options).  This cuts against any argument proffered by plaintiff that leaving Unit 1D would improve her chances at promotion – at best, the transfer to Unit 1B would maintain them.

It was essential to the decision, though, that Ortiz-Diaz had presented evidence to support his fear of future harm:  "Ortiz-Diaz proffered evidence that [his supervisor's] bias against minorities would have hindered his career advancement if he remained at headquarters, and that a transfer to work under [the potential new manager]'s supervision would have improved the likelihood that his career could advance based solely on merit."  *Id*.  The Court of Appeals found that plaintiff's declarations were sufficient to create a genuine issue of material fact on the issue since they contained objective, non-conclusory statements asserting, among other things, that the requested transfer would have afforded Ortiz-Diaz worthwhile opportunities:  to gain investigative field experience; to establish relationships with supervisors in the field; to serve in regions viewed more favorably at headquarters for the quality of their performance; and to perform important, high profile work.  *Id*. at 76.  Moreover, Ortiz-Diaz introduced evidence of bias in his current workplace, which strengthened the showing that he would be held back if denied the chance to transfer somewhere else.  *Id*.

Here, plaintiff has not alleged that the inability to transfer frustrated her career advancement, and unlike Ortiz-Diaz, she did not proffer evidence to meet her "burden to show harm from diminished career prospects."  *Ortiz-Diaz*, 867 F.3d at 75.  In the opposition, plaintiff speculates that she "could have developed better relationships" in her new position, but she has not submitted any declaration or pointed the Court to specific deposition testimony that would give rise to a question of fact on that point.  *See* Pl.'s Opp. at 21.  The record reflects that the Unit Chiefs of both Units 1B and 1D were supportive of plaintiff's career advancement, *see* Def. Produced Docs at 58, and she has not proffered evidence to the contrary.

Nor does the case involve the personal factors that also motivated Ortiz-Diaz; the opinion notes that he sought the transfer, in part, to be closer to his immediate family. *Ortiz-Diaz*, 867 F.3d. at 71.

Plaintiff has not met her burden to come forward with facts supporting a finding that she suffered a material change in the "terms, conditions, or privileges" of her employment in Unit 1D of the FBI.[27] She maintained the same pay, grade, position and promotional opportunities she held before her transfer offer was rescinded, and this case qualifies as the denial of a purely lateral transfer without more. *See Taylor*, 571 F.3d at 1321. The Court finds, in accordance with current Circuit precedent, that plaintiff failed to come forward with evidence creating genuine issue of fact to be resolved by the jury, so judgment will be entered in favor of defendant on the grounds that the revocation of the lateral transfer from Unit 1D to Unit 1B in 2011 was not an adverse event.[28]

---

27    In its January 2017 Memorandum Opinion, the Court found that granting summary judgment for defendant on the issue of the 2011 rescission was premature because the information sought by plaintiff in discovery could possibly show objective harm by "either direct, financial harm, or harm to plaintiff's prospects for advancement at the agency" despite her "somewhat thin" showing pursuant to Rule 56(d) at that time. January 2017 Mem. Op. at 10. But after the completion of discovery over three years and additional rounds of extensive briefing, plaintiff remains unable to proffer evidence of adversity on this claim.

28    What if this were an adverse event? Defendant sought judgment in its favor on the grounds that plaintiff has not come forward with evidence to undermine its legitimate explanation: that ASC Finnegan, as he stated, did not want to interfere with the EEO conciliation process by moving plaintiff to another unit. That would put the onus on plaintiff to put forth evidence that his actual motivation was retaliation.

It is undeniable that the decision was made in the wake of ASC Finnegan's awareness of the formalization of the EEO complaint; but there is also no question that ASC Finnegan was aware that plaintiff had complained about AUC Race when he stepped into the fray to craft a solution to their dispute in the first place. So timing alone would not establish a retaliatory motive.

Plaintiff argues that ASC Finnegan's initial involvement was motivated by a desire to keep plaintiff's EEO complaint from negatively affecting AUC Race's career opportunities, and that he did not act in an effort to assist her. Pl.'s Opp. at 7. But there is also evidence that he had – as his emails to other supervisors suggests – more than one motive, and retaliation must be the

## II.     2013 Actions Related to Job Duties

### A. The reassignment of plaintiff's program management responsibilities was not adverse.

Similarly, plaintiff has not pointed to a genuine dispute of fact that her reassignment from program manager to "[b]ackup" program manager of the ██████████████████████ ██████████ for the short time period between March 28, 2013, and May 31, 2013, constituted actionable retaliation. Def. Produced Docs at 135–36. According to plaintiff, this change meant that she went from overseeing a "high-profile" program to managing other programs that she

_____

but-for cause. *See* Footnote 6, *supra*; *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (contrasting the but-for standard for retaliation cases outlined in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), with the more relaxed standard in the mixed-motive discrimination provision of Title VII).

Moreover, she does not allege that his original offer of a transfer was retaliatory, and according to her own account, she worked with him cooperatively to achieve this goal for several months. *See* Pl.'s Op. at 8. And defendant argues that ASC Finnegan's email bringing an end to the transfer conversation is the undisputed evidence of his legitimate, non-retaliatory motivation when he decided he should not intervene. Def.'s Mot. at 5–6.

Plaintiff points to ASC Finnegan's deposition in support of the contention that his stated reason was merely pretextual: "[W]hen she filed a formal EEO complaint against me for not transferring her, we became – the way I saw it, we became parties on opposite sides of this issue. So I told her, we're just going to let EEO handle these things from start to finish." Deposition of Edward Finnegan [Dkt. # 137-7] (SEALED) ("Pl.'s Finnegan Deposition Excerpts") at 11.

Like ASC Finnegan's email, his deposition statements establish a causal link between the formalization of the EEO complaint and the rescission of the offer to transfer, but whether it goes so far as to supply evidence under the *McDonnell Douglas* framework that his stated reason is just a pretext to justify an act taken with retaliatory intent would be a question of fact this Court cannot resolve.

In sum, if the rescission of the offer to transfer were an adverse action, then this claim would have to be submitted to the jury, and the jury would decide the issues of whether plaintiff accepted the offer in the first instance and if she has shown the requisite intent. However, since the Court concludes that the employment action was not adverse, it will grant summary judgment in favor of the defendant on the claim. *See Chambers v. Dist. of Columbia*, 988 F.3d 497, 502 (D.C. Cir. 2021) (upholding a grant of summary judgment in the absence of evidence that would support a finding that a lateral transfer was adverse).

characterizes as "predominately low-priority." Pl.'s Opp. at 24.  But she remained a GS-14-ranked Supervisory Special Agent, and a perceived difference in how her work was prioritized is insufficient to substantiate the action as adverse under Title VII precedent.  *Forkkio*, 306 F.3d at 1129 (finding a plaintiff cannot rely on "conclusory statements of loss of prestige").[29]

Plaintiff contends that she was shifted to oversight of other less important initiatives, ones that "anybody could have handled on the unit and [which] didn't need to be [handled by her] necessarily."  Pl.'s Opp. at 27, citing Pl.'s Ramos Deposition Excerpts at 27.  But plaintiff remained a program manager over ███████████████████████████████████████████

██████████████[30]  Def.'s Ramos Deposition Excerpts at 20.  Because plaintiff retained her managerial level responsibilities for some programs, her duties in Unit 1D were essentially unchanged.  *See Forkkio*, 131 F. Supp. 2d at 40 (finding that a reorganization that left the plaintiff with the same salary, benefits, and "substantive and supervisory responsibilities he had before the reorganization" did not constitute an adverse action).  In this circuit, even where a reasonable jury could find that a new assignment "was generally less favorable than other assignments," the Court has held that there was no adverse action involved.  *Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 281 (D.C. Cir. 2005).

Nor does plaintiff provide evidence that the change in her project management duties had "adverse consequences to [her] position or future career."  *Forkkio v. Powell*, 306 F.3d at 1131.

---

[29]     *See also Mudholkar v. Univ. of Rochester*, 229 F.3d 1136, No. 00-7412, 2020 WL 1476576 (Table), at *2 (2d Cir. Oct. 4, 2000) ("[Plaintiff] failed to make any showing of materiality, because he has offered no evidence, save his own unsupported, conclusory statements, that his new position is any less prestigious or that his duties have been significantly altered.").

[30]     *See also* EEO Records at 32–33 (signed sworn statement of UC Snow discussing plaintiff's "management oversight" of a "highly sensitive program" between July and October 2013).

The record supports that SSAs within Unit 1D often rotated assignments, Def.'s Jett Deposition Excerpts at 10, and plaintiff admits that she worked on ███████████ between January 2010 and January 2014.  Pl.'s Ramos Deposition Excerpts at 22.  Between February and November 2013, the period challenged in the second amended complaint, Second Am. Compl. ¶ 17, plaintiff retained her preferred supervisory position of project manager of ████ for approximately six of the nine months; she was reassigned to that role when her replacement – who was designated as temporary from the start – retired.[31]  Def.'s SOF ¶ 72.

Plaintiff relies on *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2017), for the proposition that "withdraw[n] responsibilities can constitute a materially adverse employment action," but in that case, the court held that summary judgment is inappropriate where "a reasonable juror could find that the reassignment left the plaintiff with *significantly diminished* responsibilities."  475 F.3d at 365 (emphasis added).  Plaintiff simply proffers evidence that she was excluded from some "conversations and important ████ meetings" during that time. *See* EEO Records [Dkt. # 137-3] (SEALED) at 24–28 ("████ Decl.") at 27.[32]  But the D.C. Circuit has held there is no adverse action where changes lead to the plaintiff no longer receiving management-related communications or being invited to management meetings if those changes are unsupported by evidence of a negative effect on the employee's career.  *See Forkkio*, 306 F.3d at 1130–31.

---

[31]    Soon after plaintiff was rolled off the supervision of ████ again in October 2013, she details in her EEO complaint that she was assigned even more leads. *See* EEO Records at 8.

[32]    ███████ was a Management and Program Analyst ("MAPA") in Unit 1D between June 2010 and December 2013. *Id*. at 26.  She states she was "aware that from February 2013 through November 2013,  [plaintiff] was excluded from meetings regarding her assigned projected projects and programs," and "on occasion, [she] observed personnel meeting [sic] in the CD-1D unit space and discussing matters pertinent to [plaintiff]'s assigned programs and projects" which "[plaintiff] confirmed . . . had taken place without her participation." *Id*. at 27.

The complained-of loss of access to the main investigative database, though, could potentially constitute the sort of "adverse consequence" to plaintiff's position if it was directly tied to the reassignment to "[b]ackup" program manager of ███. *Forkkio*, 131 F. Supp. 2d at 41. The same is true of plaintiff's statements regarding the required reporting of her "time and attendance" to her supervisor UC Snow.   In support of these allegations, though, plaintiff relies solely on the declaration of MAPA ███, who had little of substance to say, and whose only source is plaintiff herself:

> [Plaintiff] told me that UC Snow assigned her more leads than anyone else and treated her differently than the other employees in the unit.  I am also aware that [plaintiff] became very upset after UC Snow removed her as the Program Manager from the ████████████████████ and changed her leave from Leave Without Pay (LWOP) to Absent Without Leave (AWOL).

███ Decl. at 27.

This information cannot support a finding that the reassignment was materially adverse, as it is little more than plaintiff's expression of dissatisfaction with her role.  Moreover, plaintiff does not tie these changes to a particular time period, or even to her reassignment.  *See* Pl.'s Ramos Deposition Excerpts at 16–19.  Without more, the Court cannot find there is evidence in the record to support a conclusion that her reassignment to "[b]ackup" program manager led to these changes. Because a reasonable jury could not find that there was a meaningful reduction in program management duties such that any hardship was created for plaintiff between March and May 2013, there is no evidence that the action was adverse.[33]

---

33    Plaintiff continued significantly the same work as a program manager for other projects. *See* Pl.'s Ramos Deposition Excerpts at 24.

**B. Even if the shift in responsibilities was adverse, plaintiff has not come forward with evidence to show that the agency's proffered legitimate reasons were pretextual.**

The standard for what constitutes an adverse action in a retaliation case is lower than for a discrimination case. *See Baloch*, 550 F.3d at 1198 n.4. In light of this standard, even if the Court were to reach the opposite conclusion that the reassignment was adverse, plaintiff has not adduced evidence to create a jury question on whether the action was retaliatory.

First, plaintiff has not produced any evidence that AUC Jett initiated the effort to find a find a temporary substitute program manager for ███████ before plaintiff's protected activities took place in 2013. On March 13, 2013, plaintiff filed the complaint in this case, and it was served on defendant on March 19. *See* Compl.; Return of Service. On March 28, 2013, AUC Jett reassigned her as "[b]ackup" program manager for ███████.

Although this window of approximately two weeks could be sufficiently close in time to be evidence of a causal connection,[34] crucially, plaintiff has introduced no evidence to show that AUC Jett knew of these protected activities when the assignment of Wagoner as program manager went into effect.[35] *Laboy*, 2002 WL 1050416, at *1 ("[B]ecause the official responsible for ordering appellant's termination was unaware of appellant's prior EEO activity, appellant failed to establish a prima facie case of retaliation."), citing *Breeden*, 532 U.S. at 270–71 (holding that the alleged discriminating employer's knowledge of protected activity must precede the consideration of the adverse action); *see also Buggs v. Powell*, 293 F. Supp. 2d 135, 150–51 (D.D.C.2003) (finding that plaintiff was unable to establish the knowledge requirement for

---

34    *Compare Taylor*, 571 F.3d at 1322 (holding that just over two months was too long to establish a causal link).

35    The fact that Wagoner was assigned as program manager for ███████ in advance of his impending retirement, and not as a TDY-er as was discussed in January 2013, is irrelevant for the sake of the causal analysis.

non-selection for a position because "the record indicate[d] that the selecting official was unaware of plaintiff's prior protected activity"). Under this controlling precedent, plaintiff cannot establish the requisite causal connection.[36]

Moreover, defendant came forward with a legitimate, nonretaliatory reason for plaintiff's reassignment to "[b]ackup" program manager of ████, based on the emails and deposition of her immediate supervisor at that time, AUC Jett. He stated in an email to plaintiff on January 3, 2013, that during her medical leave in the winter of 2012-2013, he was having trouble managing plaintiff's duties in addition to his own, and he was worried that she would be overwhelmed upon her return to Unit 1D. Pl.'s Jett Deposition Excerpts at 31; *see also* Def.'s Jett Deposition Excerpts [Dkt. # 133-6] at 14–15. And it was at that time – two months *before* the filing of this action and the second formal EEO complaint – that Jett notified plaintiff of the possibility that he would assign someone else as ████ program manager to provide help while she was out.

Given that AUC Jett communicated to plaintiff in January 2013 that he was overwhelmed with her workload in her absence, that he was considering placing a different program manager on ████, and his concern – clear on the face of his emails – for her general well-being when she returned to work, the Court concludes that defendant has met its burden to demonstrate a legitimate, nondiscriminatory reason.

Another legitimate, nondiscriminatory explanation offered by defendant is that it was common for program managers to regularly rotate in Unit 1D. *See* Def.'s Mot. at 19; *see also*

---

36      Even if AUC Jett knew of plaintiff's 2011 complaint, it is too far in the past to create any inference of causality. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2011) (collecting cases) ("Although courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length.").

Pl.'s Jett Deposition at 10–11. According to her deposition, plaintiff handled the ▮▮▮ "off and on" between January 2010 and July 2014. Pl.'s Ramos Deposition Excerpts at 22. She stated in her deposition that she "do[es]n't remember the exact dates when [she] was the program manager ▮▮▮ and when [she] was not."[37] *Id*. And plaintiff was reinstated as program manager after two months, by the end of May 2013. On these facts, there is not enough to rebut defendant's explanation that program management assignments shift, especially in light of the evidence that plaintiff was assigned to and away from ▮▮▮ multiple times over the course of four years.

Since defendant made the requisite showing to support its nondiscriminatory explanation, the dispositive inquiry is whether plaintiff has come forward with evidence that the reassignment was retaliatory in nature. But plaintiff has not pointed to any evidence that creates a jury question on whether the stated reasons for the employment actions were pretextual. As a result, summary judgment is appropriate for defendant on the DAOP reassignment claim.

### III.    The Denials of the Requests to Transfer in 2013 and 2014

In 2013 and 2014, plaintiff applied to three positions – IOD, BFO, and NYFO – in order to transfer out of Unit 1D, and she was not selected for any. Def.'s SOF ¶¶ 37, 41, 56. Plaintiff asserts that the decisions to select other candidates were retaliatory, but here too, she has not shown any facts that would enable a jury to conclude that her inability to transfer constituted adverse employment action. "Title VII promises [a plaintiff] nondiscriminatory consideration for [a no-cost transfer] where consideration is held out as a privilege of employment." *Ortiz-Diaz*,

---

37    On May 20, 2014, plaintiff drafted her application for consideration for a voluntary rotation to a GS-13-ranked position at the NYFO, discussed *infra*, and the document details her previous work experience at the FBI, including her time at Unit 1D. In her own words: "As an SSA in CD-1D, [plaintiff] has successfully managed the following programs: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Produced Docs at 74.

867 F.3d at 75, quoting *Hopkins v. Price Waterhouse*, 920 F.2d 967, 978 (D.C. Cir. 1990) (internal quotations omitted).  The operative question is whether a reasonable factfinder could find that the transfer denial created any material adversity.  *See Brady*, 520 F.3d at 495.

### A.  The denials of plaintiff's three transfer requests were not adverse.

Plaintiff's showing with respect to these transfers suffers from the same defects as the evidence on the 2011 lateral transfer:  plaintiff has not shown she suffered any hardship as a result. As discussed above, plaintiff's dissatisfaction with Unit 1D is not commensurate with the showing made by the plaintiff in *Ortiz-Diaz* that he had been subjected to "career-stifling transfer denials." 867 F.3d at 73.

After another SSA was selected for the non-competitive lateral transfer to IOD, plaintiff remained within her unit – with the same compensation, duties, and promotional opportunities. Similarly, the denials of plaintiff's requests to transfer to GS-13-ranked Special Agent ("SA") positions in the BFO and NYFO did not change her role at the FBI.  Plaintiff was a GS-14 Supervisory Special Agency ("SSA") in Unit 1D at the time she applied to the BFO on April 11, 2014, and to the NYFO on May 20, 2014.  *See* Def. Produced Docs at 73, 81.  Indeed, plaintiff attested that she would "step down" to the SA position in order to complete the transfer.[38] Def. Produced Docs at 76.  Other courts in this district have recognized that a denial of what would be a constructive demotion via transfer, lowering an employee's compensation if granted, is not recognized as an actionable adverse action under Title VII law.  *See Ortiz-Diaz*, 75 F. Supp. 3d at 566 ("[The] denial of a transfer request that would have resulted in a reduction in pay and the employee's demotion within the organization, without more, cannot constitute an

---

[38]    The four-page document sent in consideration for the transfer to the NYFO was drafted by plaintiff and approved by three of her supervisors.  Def. Produced Docs at 73.

adverse employment action."); *see also Brookens v. Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009),

citing *Burlington N.*, 548 U.S. at 67 (the denial of a detail that would have provided training,

experience, and opportunities for promotion was not adverse in the absence of some detriment to

the plaintiff's present employment:  the "anti-retaliation provision protects an individual not from

all retaliation, but from retaliation that produces an injury or harm.").

Plaintiff posits now that a "different chain of command" would have let her "develop[]

better relationships."  Pl.'s Opp. at 23.  Plaintiff also asserts that the transfers would have advanced

her career opportunities because "her career options were diminishing" in Unit 1D, but she does

not cite to any support for these contentions in the record.  *Id*. at 24.  And a mere failure to transfer

an employee that forces her to remain in a position with "which she is dissatisfied or even feels

demeaned, is . . . not actionable," *Morrison v. Mills*, 928 F. Supp. 2d 241, 246–47 (D.D.C. 2013),

discussing *Holcomb*, 433 F.3d at 902.  For all of these reasons, the Court will grant summary

judgment for the defendant because plaintiff has not established that her non-selection for the

transfers was materially adverse.

### B. Even if the transfer activity was adverse, plaintiff has not come forward with evidence to show that the agency's proffered legitimate reasons were pretextual.

Out of an abundance of caution, though, the Court will also assess whether plaintiff has

pointed to evidence that would show the agency's stated reasons are pretextual, and it finds that

she has not.

Defendant has offered a legitimate, nonretaliatory reason for the selection of another

candidate over plaintiff for the IOD transfer:  seniority.  SSA Larsen had an earlier Bureau EOD

entry on duty ("EOD") date than plaintiff's, and the email correspondence from DAD Smith

specifically identifies that as the basis for her final decision.  Def. Produced Docs at 152.

According to the sworn testimony of the Assistant Director of the Counterintelligence Division,

lateral transfers were ranked by EOD date, [Dkt. # 133-2] ("Def.'s Anderson Deposition Excerpts") at 2–5 (describing that the Bureau EOD stands for "entry on duty" and is "how everything is calibrated . . . it's all by seniority"), and it is undisputed that plaintiff had a lower Bureau EOD rating than the candidate who was ultimately selected for the position.  *See* Def. Produced Docs at 149–50.  While plaintiff makes much of her "HQ" EOD date rating for seniority, there is evidence in the record to support that the metric she highlights is not controlling in determining a preferred candidate for voluntary transfer.  *See* Def.'s Anderson Deposition Excerpts at 5–6 (describing that lateral transfers go by EOD date).

For the BFO and NYFO transfers, defendant has proffered that there was a legitimate reason for the denials:  her ███████████ Performance Appraisal Report ("PAR") rating for November 2013.  *See* Def. Produced Docs at 16–18.  Although plaintiff takes issue with whether the *issuance* of her PAR rating was retaliatory, *see* Pl.'s Opp. at 34–35, she does not dispute the fact that the FBI Transfer Unit used an objective score cutoff for intra-agency transfers, and that her rating fell below the threshold that year.  *See* Def.'s SOF ¶¶ 56–57; Pl.'s Opp. to SOF

¶¶ 56–57.[39]   Because the Court finds that defendant has offered a legitimate nondiscriminatory rationale for its 2013 and 2014 transfer actions, the burden shifts to plaintiff to provide evidence that the proffered reasons were pretextual.   One way to do this is to consider the evidence supporting the *prima facie* case, i.e., whether there was a causal connection between the protected activity and the selection of other agents for the transfers.

The evidence of temporal proximity is not strong.   Plaintiff's second formal EEO complaint was filed on September 27, 2013, and DAD Smith's selection of SSA Larsen for the IOD transfer was communicated via email on October 31, 2013.   A month may be sufficiently close in time to support a retaliatory inference, *see, e.g.*, *Geithner*, 666 F.3d at 1357 (finding that a short period of time between a contested action and the protected activity can support an inference of causation), but the contested denials of the transfers to the BFO and NYFO occurred in April and May of 2014 – more than six months after the EEO complaint.   A period of six months between the protected activity and the employment action is not generally recognized in this circuit to give rise to an inference of causation. *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011)

---

39      Plaintiff attempts to use her 2013 ▊▊▊▊▊▊▊ PAR rating as the foundation for her claim that the denials of the transfers to BFO and NYFO were retaliatory by repeating the allegation in the complaint that the rating "itself was given in retaliation for engaging in protected activity." Pl.'s Opp. to SOF ¶ 56; Second Am. Compl. ¶¶ 17(b)(ii)–(iii).   But the Court ruled more than five years ago that plaintiff could not amend her complaint to include the 2013 ▊▊▊▊ ▊▊▊▊ PAR rating as a basis for a claim, *see* Min. Order (Nov. 10, 2015), *see also* Transcript of Proceedings on Nov. 10, 2015 [Dkt. # 49], and she cannot revive the excluded claim by attempting to shoehorn it in now.   Even if the Court were to allow plaintiff's back-door allegation of retaliation to proceed at this late date, she has not proffered evidence that the score constitutes an adverse employment against her.   An employee can make out a case based on such changes in performance review when it is tied to "financial harms," *Baloch*, 550 F.3d at 1199, but plaintiff has not alleged any specific financial harm arising from the 2013 PAR rating, and the two transfer requests denied in reliance on the PAR score did not affect her compensation as an SSA in Unit 1D. *See also Taylor*, 571 F.3d at 1321 ("[Plaintiff]'s bare, conclusory allegation that she was denied promotional and bonus opportunities as a result of [the employer]'s unlawful conduct in violating Title VII's prohibition against retaliation does not discharge her burden to show the evaluations were attached to financial harms.").

("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three or four months of the protected activity[.]") (collecting cases); *see also Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61–62 (D.D.C. 2005) (finding that three-month period was sufficient but a six-month period was too long).

More important, plaintiff has not established that the transfer decisionmakers were aware of her lawsuit and EEO complaints. Here, the evidence provided by the parties shows that plaintiff's request to move to IOD was rejected by a selecting officer outside of her immediate chain of command.[40] Plaintiff did not provide evidence that this official, DAD Smith, had any knowledge of her prior EEO complaints when reaching a decision on who could join IOD, and so she cannot establish defendant's retaliatory pretext regarding the IOD transfer denial.[41] *See Breeden*, 532 U.S. at 272–73.

Plaintiff has also not proffered any evidence that the BFO and NYFO transfer decisionmakers had any knowledge of her protected activity. Without this, there is no genuine question for the jury to decide about their motivation. It is uncontested that plaintiff was denied the transfer opportunities by the FBI Transfer Unit, not her supervisors in Unit 1D,

---

[40]   Plaintiff contends that the "first stage of the selection process, which was overseen by [plaintiff]'s direct supervisors . . . cannot [be] erase[d] . . . from the record." Pl.'s Opp at 34. The Court agrees. The evidence supports that plaintiff was referred up the chain of command for the IOD transfer by her supervisors, but without more, it does not support any inference that DAD Smith had knowledge of plaintiff's protected activity as a result.

[41]   The Court also finds that plaintiff's argument that she was "already eliminated from consideration" due to the interference of her supervisor UC Brooks before DAD Smith made her final selection is unsupported by the record. Pl.'s Opp. to SOF ¶ 41. Plaintiff points to the Brooks Deposition Excerpts, [Dkt. # 137-5] (SEALED) at 18–19, but that evidence does not support a claim that he intervened to her detriment; he simply testified that he communicated regularly by email and in person with DAD Smith. Nor is it relevant that DAD Smith solicited input from Brooks in an email on October 30, 2013. *See Vickers v. Powell*, 493 F.3d 186, 193 (D.C. Cir. 2007) (finding that a reasonable jury could not find a "retaliatory motive at work" when the decisionmaker did not participate in any of the alleged incidents that made up the Title VII claim).

Def.'s SOF ¶ 56, and that she was fully recommended for both transfers by her division head. *See* Def. Produced Docs at 76, 85.  There is no suggestion of any retaliatory motivation on the part of the Transfer Unit, as plaintiff's denials were in line with the FBI Employee Transfer Policy Guide, which requires that "[a]ll agents must achieve a rating of 'Successful' or better on their most recent performance appraisal to be considered for [Voluntary Rotational Transfer]s." Def. Produced Docs at 100.

In sum, plaintiff has failed to produce evidence that would enable a jury to conclude that the agency's stated grounds were pretextual, and the Court will grant summary judgment for defendant on these claims.

<b>CONCLUSION</b>

For these reasons, the Court will **GRANT** defendant's motion for summary judgment on the retaliation claim.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 31, 2021

35